## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CHARLES E. COOLEY, JR.,    )
AIS # 00230863,    )
    Plaintiff,    )
    )
v.    )    CIVIL ACTION NO. 1:18-00540-JB-N
    )
WILLIAM STREETER, *et al.*,    )
    Defendants.    )

## REPORT & RECOMMENDATION

Plaintiff Charles E. Cooley, Jr., an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R). After careful review, it is recommended that summary judgment should be **granted**, **in part**, and **denied**, **in part**, as discussed herein.

## I.    Background.

On December 20, 2018, Plaintiff Cooley filed this § 1983 action against Warden William Streeter, Lieutenant Alfie Pacheco, Sergeant Christopher Earl, Officer Jermaine Bullard, and Sergeant Charles Arthur for use of excessive force and denial of medical care in violation of the Eighth Amendment and against Nurse Lisa Dixon for denial of medical treatment in violation of the Eighth Amendment. (Doc. 1). Cooley seeks monetary damages in the amount of $30,000 from each defendant (jointly and severally), nominal damages, and he further

requests that the court order an MRI be performed and order appropriate, necessary medical treatment be provided. Additionally, Cooley requests that he be transferred to another facility, that any and all disciplinary reports be removed from his institutional file, and that criminal charges be brought against the officer defendants.

The Defendants have answered the suit denying in full the allegations against them and filed special reports in support of their positions. (Docs. 26, 27, 56, 57). As part of their special reports, Defendants have submitted personal sworn affidavits, prison medical records (including body charts, sick call requests, and grievances), and the prison's I&I Investigative Report related to the incident subject of this complaint. On December 26, 2019, the Court converted the Defendants' Answers, Special Reports, and exhibits to a Motion for Summary Judgment. (Doc. 60). Plaintiff has responded in signed/unsworn oppositions to the motion (reiterating the allegations and facts in his complaint) and advised the Court of his intent to proceed with litigation.[1] (Docs. 63-65).

---

[1]    See, e.g., Dudley v. City of Monroeville, Ala., 446 F. App'x 204, 207 (11th Cir. 2011) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not—and properly did not—rely on the content of the citizen's statement[]"); Vondriska v. Cugno, 368 F. Ap'px 7, 8-9 (11th Cir. 2010) ("....to support a motion for summary judgment under Rule 56(e), testimony must be sworn, competent and on personal knowledge, and set out facts that would be admissible in evidence at trial[]"); McCaskill v. Ray, 279 F. App'x 913, 915 (11th Cir. 2008) (litigant's unsworn allegations were not admissible on motion for summary judgment); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) (same).

After a thorough review of the record, it is determined that this motion for summary judgment is now ripe for consideration.

## II.    **Summary Judgment Standard**.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. See Anderson, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases

where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).

## III.    Summary Judgment Facts.[2]

On or about January 30, 2017, random searches for contraband were being conducted at Holman Correctional Facility's ("Holman") Restrictive Housing Unit. At approximately 8:15 a.m., correctional officers approached Plaintiff Cooley's cell and ordered him to submit to restraints for a cell search. It is undisputed by the parties that Defendant officers Warden Streeter, Sergeant Arthur, Lieutenant Pacheco, Officer Bullard, and Lieutenant Earl were present at the search of Cooley's cell.[3]  From here, the parties' version of the facts diverge.

---

[2]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[3]    Defendants have submitted affidavits describing the incident in question. Lieutenant Christopher Earl affirms that he "was present during the search of inmate Charles Cooley B/230863 in cell M-64. . . ." (Doc. 57-3).  Contrarily, when interviewed by Agent Jones in connection with Holman's I&I investigation of the incident, Earl maintained that he was not present during the search of Cooley's cell.  (See Doc. 57-6 at 2).  Instead, Earl told Investigative Agent Jones that he was assisting the CERT Team in cell searches but "was in the next cell (M-66) dealing with Inmate Silas Jackson when the CERT team members were dealing with Inmate Cooley" and did not participate in the escorting of Cooley to the elevator or health care unit.  (Id.).  Earl did, however, corroborate the version of facts put for by Streeter, Arthur, Pacheco, and Bullard, that Cooley was hostile, threatening and that no force was used inside the cell.  (Id.).

Plaintiff Cooley states he said, "ok", and immediately Sergeant Arthur deployed pepper spray "into the plaintiff['s] cell in the facial area causing the plaintiff difficult to breathe and his eyes face and body to burn severely causing him to fall back into the cell trying to receive his wind back because the spay[sic] was hindering the plaintiff wind causing him to be out of breath." (Doc. 1 at 4). Cooley then put his hands out of the tray door, the officers placed handcuffs on him, and removed him from his cell. Cooley claims he told Officer Earl he was having trouble breathing, but Warden William Streeter, ordered Cooley, "to shut the fuck up." (Id. at 5). Cooley restated that he could not breath and Warden Streeter ordered several officers to put Cooley on the elevator. While in the elevator (handcuffed with his hands behind his back and not resisting), Cooley alleges Warden Streeter ordered the officers "to put the sticks on the plaintiff." (Id.). Cooley claims he "received over (30) lashes (hits) in his rib and back with night sticks by officer Alfie Pacheco, Jermaine Bullard, A. Christopher Earl, C. Arthur, and William Streeter, . . . causing serious physical injury to the plaintiff, spinal cord, kidney area, leaving knots in those areas, swelling in the plaintiff stomach, migraine headache." (Id.).

Upon exiting the elevator, Cooley was taken to the health care unit (at approximately 8:25 a.m.), but Cooley claims Nurse Lisa Dixon denied him a body chart, eye wash, and decontamination shower, specifically stating, "ain't nothing wrong with him[;] he's ok[;] he still can talk." (Id.). Cooley asserts he was placed back in his Restrictive Housing cell, still suffering breathing difficulties and

burning of his body, face, and eyes.  Cooley further claims that on January 31, 2017, he returned to the health care unit for chest pain and breathing difficulties because of the previous day's events and received a body chart.  (Doc. 1 at 6).  According to Cooley, he subsequently sought medical treatment for pain/injuries related to the January 30, 2017 incident on February 1, 2017 and received a second body chart.  He also claims filing multiple grievances and administrative complaints regarding the use of force on January 30, 2017, which instituted the opening of an Internal Investigation.  Cooley avers that he has been housed in segregation since the incident and "still severely damage do [sic] to undue force." (Id. at 8).

Defendants, on the other hand, contend that Cooley refused to submit to restraints for a cell search on January 30, 2017 when ordered.  Warden Streeter and Sergeant Arthur aver that:

> Inmate Cooley refused to comply with the order and proceed to cover his cell's window with a blanket; obstructing the view of the Officers. Correctional Sergeant Arthur administered a one second burst of "Sabre Red" chemical agent through the tray entrance of the cell; striking inmate Cooley in the facial area.  The use of force was terminated once inmate Cooley's resistance ceased and inmate Cooley was able to be placed in the appropriate restraints.

(Docs. 57-1 at 1-2; 57-2 at 1-2).  Lieutenant Christopher Earl, Officer Jermaine Bullard, and Lieutenant Alfie Pacheco aver that Cooley refused the direct verbal order (or orders) to be handcuffed and searched but fail to describe any overt action indicating noncompliance on the part of Cooley.  (Doc. 57-3; 57-4; 57-5).  All officer defendants, however, maintain that once Cooley was restrained, Cooley

was removed from his cell, his cell was searched, and a contraband cell phone was discovered and confiscated. Defendants contend that during the cell search, Cooley became "hostile and began to make threats" toward several officers (docs. 57-1 at 2; 57-2 at 2; 57-3 at 1; 57-4 at 1), attempting to incite other inmates by loudly yelling, "I'm gonna start a riot in the Motherfucker; we are going to kill all of you Motherfucking officers on this White Man's Plantation." (Doc. 57 at 4-5). According to Defendants, the other inmates "became hostile and started pulling on their cell doors trying to get out." (Id. at 5). Cooley further stated he was "going to put a ten thousand dollar hit" on Defendant Officers Earl, Bullard, and Streeter, and Streeter "verbally reprimanded" Cooley concerning his behavior. (Id. at 5).

Defendants assert that Cooley was escorted to the health care unit for a medical assessment and decontamination. While in route to the health care unit, Cooley complained of shortness of breath; however, according to Defendants, Cooley refused medical attention once he arrived at the health care unit. Cooley continued to threaten the officers and was placed in leg irons and returned to the Restrictive Housing Unit. Cooley was charged with: (1) failure to obey a direct order of an ADOC employee, (2) unauthorized possession of a phone, (3) threats, (4) intentionally creating a security, safety, or health hazard, and (5) exciting a riot.[4]

---

[4] The outcome of these disciplinary charges is unclear from the record before the Court. The I&I Investigation Report indicates that Cooley was found guilty

In support of their position, Defendants have submitted the medical records and the I&I Investigation Report related to the January 30, 2017 incident.

The body chart completed on January 30, 2017 (immediately following the incident, at approximately 8:25 a.m.) reflects that Cooley stated, "I don't need a body chart", and Nurse Dixon affirms that Cooley signed a Release of Responsibility form declining a body chart. (Docs. 57-1 at 4; 27-1 at 3).

The submitted medical records further evidence that Cooley returned to the health care unit that same evening, at approximately 11:50 p.m., with complaints of left-side chest pain from being "physically assaulted today by DOC." (Doc. 27-2 at 3). Cooley specifically complained of being hit in the chest and back with sticks, and the nurse noted abrasions to his back, middle back, and lower back and conducted an EKG (the results of which were communicated to the prison doctor, who ordered Cooley to "lay in" until the morning). (Id. at 4). Cooley was also examined the following day, January 31, 2017, stating that he was physically assaulted by correctional officers on January 30, 2017; the examination notes state:

> V/S BP/SI/80 P90 R=18 T=98.3 OZ=98%. Inmate has busted lower lip also has redness and bruising noted to L upper middle of back. Zero physical stress noted. Return to health care unit as needed.

---

of all charges. (Doc. 57-6 at 4). Cooley, however, alleges that the charges of intentionally creating a security, safety, or health hazard, unauthorized possession of a phone, and threatening were "approved", but the charges of inciting a riot or rioting and failure to obey a direct order of an ADOC employee were "disapproved". (Doc. 1 at 6).

(Doc. 27-1 at 4; Doc. 27-2 at 5).[5] The record further reveals Cooley filed multiple, subsequent sick call requests with complaints of suffering pain from the assault; however, conducted x-rays revealed no fractures or abnormalities.[6]

Relying heavily on the lack of a January 30, 2017 body chart, the Investigations & Intelligence Department concluded Cooley's claims of excessive force were "unable to [be] substantiate[d]", and, thus, the investigation was closed. (Doc. 57-6 at 4-5). Review of the Investigation Report reveals that Agent David Jones investigated Cooley's allegations that Warden William Streeter, Lieutenant Alfie Pacheco, Sergeant Charles Arthur, Sergeant Christopher Earl, Lieutenant Brandon McKenzie, and Officer Jermaine Bullard used excessive force against him on January 30, 2017.[7] As part of the investigation, Agent Jones reviewed the video footage from the Segregation elevator on January 30, 2017. The Report provides:

---

[5]    Cooley subsequently sought medical treatment on February 1, 2017, as well as February 11, July 10, July 12, September 15, September 17, 2017, and he further submitted multiple complaints and grievances regarding the incident.

[6]    Cooley's subsequent sick call requests and medical records are discussed *infra* at Section IV, B.

[7]    The Investigative Report describes identical facts to those asserted in Cooley's complaint with the following exceptions: Cooley advised that an officer yelled through the cell door for him to turn around to be cuffed up, and Cooley stated that he was putting his shoes on when one of the officers sprayed Cooley in the face with mace. The CERT team officers then entered Cooley's cell and placed handcuffs on Cooley. Cooley further claims that while in the elevator, "he was slammed to the floor in the elevator, at which time CO Bullard struck Inmate Cooley 25 to 30 time[s] with the baton to Inmate Cooley's back, side and legs." (Doc. 57-6 at 1).

> As the elevator doors open, the video surveillance clearly shows Inmate [Cooley] on the floor of the elevator. Lt. Pacheco assists Inmate Cooley from the floor, as Warden Streeter, Lt. McKenzie, Sgt. Arthur and Correctional Officer Jermain Bullard exit the elevator while assisting Inmate Cooley to the Health Care Unit.

(Doc. 57-6 at 2). According to the Report, on February 27, 2017, Sergeant Earl, Lieutenant Pacheco, Jermaine Bullard, and Brandon McKenzie were interviewed regarding Cooley's complaint against them:

Sergeant Earl advised that he assisted the CERT Team in cell searches on January 30, 2017. He also stated that during the cell searches, Cooley refused to "cuff up" and had to be sprayed with SABRE RED; he was then handcuffed and taken to the health care unit. However, Sergeant Earl further advised that he was not present at Cooley's cell during the CERT Team's entrance into Cooley's cell (because he was assisting with the cell search of the cell next to Cooley's) and he did not assist in escorting Cooley to the health care unit and was not in the elevator at the time of the alleged assault. (Doc. 57-6 at 2).

Lieutenant Alfie Pacheco confirmed assisting with the search of Cooley's cell and Cooley's escort to the health care unit. Pacheco provided Cooley refused to "cuff up" and "had to be sprayed" before being secured in handcuffs and further stated "that at no time while on the elevator did Inmate Cooley go to the floor." (Doc. 57-6 at 2). Agent Jones then asked Pacheco several times if Cooley was slammed to the floor, forced to the floor, or went to his knees while in the elevator, and Pacheco denied any and all versions. Agent Jones then asked if Pacheco's response would change if there were a video which showed Cooley getting up from the floor of the elevator. Pacheco responded no and asked, what exactly Agent Jones wanted to know. Agent Jones then informed Pacheco that Cooley filed a complaint stating he was assaulted on the elevator, to which Pacheco stated, "that while not having the best memory or recollection of what happened while inside the elevator, he does not remember Inmate Cooley going to the floor." (Id.).

Officer Jermaine Bullard confirmed assisting with the search of Cooley's cell on January 30, 2017 and provided that Cooley refused three or four times to "cuff up" before SABRE RED was sprayed to compel compliance. Bullard further provided that he was not given instructions by Warden Streeter to strike Cooley, and Cooley never went to the floor in the elevator. After being confronted with the possibility of video evidence, Bullard stated "he does not remember Inmate Cooley going to the floor and believes Inmate Cooley never went to the floor in the elevator." (Doc. 57-6 at 3).

On February 28, 2017, Agent Jones interviewed Lieutenant Brandon McKenzie and conducted a follow-up interview with Lieutenant Pacheco after determining that Pacheco "was not truthful during the previous interview" (Doc. 57-6 at 2):

Pacheco admitted to speaking with Officer Bullard and Sergeant Arthur about the incident, despite being instructed by Agent Jones during the first interview not to talk to anyone while the investigation was ongoing. Furthermore, Pacheco was shown the video of Cooley "clearly . . . on his knees, getting up from the elevator floor as the elevator doors open." When asked if he would like to change his testimony due to the video of the incident being inconsistent with his statement, Pacheco refused and declined to submit to a Polygraph Test. (Doc. 57-6 at 2).

Lieutenant McKenzie confirmed assisting with the cell search of Cooley on January 30, 2017 and stated that Cooley refused orders to "cuff up" and had to be sprayed with SABRE RED. McKenzie stated that while Cooley was verbally abusive, threatening to put "hits" out on the officers, he was not struck while in the cell or the elevator. McKenzie further stated that "at no time while on the elevator did Inmate Cooley go to the floor, forced or inadvertently." (Doc. 57-6 at 3). McKenzie maintained "that while on the elevator, Lt. McKenzie's eyesight was not 100% due to the effects of the of the spray but he didn't see anyone strike Cooley with a baton, fist, or hand." (Id).

On March 1, 2017, Sergeant Charles Arthur was interviewed:

Sergeant Arthur provided that Cooley refused (three or four times) to "cuff up" before Sergeant Arthur administered a one second burst of SABRE RED in the face of Cooley and handcuffs were placed on Cooley. Sergeant Arthur stated that Cooley was extremely belligerent, yelling for the other inmates to riot, and threatening to put a hit out on the officers. While Arthur advised that Cooley was not hit or struck in the elevator, he maintained that Cooley "may have slumped down due to the effects of the SABRE RED." (Doc. 57-6 at 3).

On March 13, 2017, Agent Jones conducted his final interviews with

Warden William Streeter[8] and Nurse Lisa Dixon:

Warden Streeter advised that while conducting cell searches on January 30, 2017, Cooley refused to "cuff up". Streeter stated that Cooley had his cell window covered with paper and had a bed sheet hanging in the cell to assist Cooley in concealing his activity while inside the cell. Streeter stated he again instructed Cooley to "cuff up", and again Cooley refused. A one second burst of SABRE RED was administered to the face of inmate Cooley and handcuffs were placed on him. Streeter advised that Cooley was irate, threatening to put "hits" on officers and yelling in attempt to get the other inmates to riot. Streeter further advised "that while on the elevator, Inmate Cooley was complaining about having trouble breathing due to the SABRE RED exposure" and at one point "Cooley did go down to one knee while trying to catch his breath." Street denied giving orders for any officer to strike Cooley while in route to the health care unit but maintains that Cooley's threats continued until they reached the health care unit, where Cooley refused a medical assessment. Cooley was escorted back to his cell in Segregation. According to Streeter, Cooley "calmed down" once advised of the disciplinary charges he would receive related to the day's events. Warden Streeter further stated that he would not submit to a Polygraph Test.

Nurse Dixon advised that when Cooley arrived in the medical unit, he refused to sit down and shouted "I don't need a body chart". (Doc. 57-6 at 4). She indicates he was "irate and threatening the officers" (shouting, "On my Mother's life, I'm going to kill you") and leg irons were placed on Cooley. (Id.). After refusing a body chart, Cooley was escorted out of the health care unit, but she explains he returned the following day for a body chart.

The Investigation Report details that Cooley was found guilty of all five

disciplinary charges brought against him. The Report also dictates that Pacheco,

McKenzie, Arthur, and Bullard were found to be "untruthful, evasive and/or

intentionally omitting pertinent facts during their statements given to Agent

Jones regarding the incident in dealing with the fact that Inmate Cooley went to

---

[8]    According to the Investigative Report, Warden William Streeter was interviewed upon his return from a two-week school in Colorado. (Doc. 57-6 at 3).

the floor while on the elevator." (Doc. 57-6 at 4). According to Agent Jones, as indicated in the Investigative Report, he was unable to substantiate Cooley's claims that Cooley was struck 30 times in the ribs and side because "a medical assessment was [not] completed [until] January 31, 2017, at approximately 1107 hours, which was the day after the alleged assault. While the body chart revealed Cooley had an injury to his lower lip, and visible redness and bruising to Cooley's upper and middle back area, it was determined that these injuries could possibly be self-inflicted. As such, Agent Jones was "unable to substantiate that these injuries came as a result of the assault alleged by Inmate Cooley that occurred as a result of the actions of the Correctional Staff." (Doc. 57-6 at 4-5).

## IV. Analysis.

Cooley has brought this action pursuant to 42 U.S.C. § 1983. "In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005)). There is no dispute that the named defendants, as employees of the Alabama Department of Corrections and its contracted medical provider, are state actors for purposes of this action. Thus, to establish his asserted claims, Cooley must establish that the named defendants, personally, acted to deprive him of a constitutional right.

**A. Excessive Force.**

In an Eighth Amendment excessive force case, as this one, the "core judicial inquiry" is "whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley v. Gaddy</u>, 559 U.S. 34, 37 (2010) (holding that the gratuitous beating of an inmate, even without serious injuries, violated the inmate's Eighth Amendment rights). Factors relevant to this determination include the "need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1300 (11th Cir. 2002). Importantly, once the need for force ceases, any continued force applied can constitute an Eighth Amendment violation. <u>Williams v. Burton</u>, 943 F.2d 1572, 1576 (11th Cir. 1991). When considering these factors, courts afford "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." <u>Fennell v. Gilstrap</u>, 559 F. 3d 1212, 1217 (11th Cir. 2009) (quotation marks omitted).

When these standards are applied to the facts presented by the parties, genuine issues of material fact exist with respect to Plaintiff's Eighth Amendment excessive force claim. Cooley alleges two instances of excessive force used against him. First, Cooley alleges he was sprayed with a chemical agent despite full compliance with the defendant officers' orders. Second, he claims he was struck

with batons (multiple times), while restrained and not resisting. Review of the record reveals the factual details are conflicting regarding the need for force and amount used. Indeed, the parties' versions of the facts completely contradict one another.

The court starts with the general rule that prison officers are authorized to use force when a prisoner repeatedly fails to obey an order, and officers are not required to convince every prisoner that their orders are reasonable and well-thought out before resorting to force. <u>Pearson v. Taylor</u>, 665 F. App'x 858, 864 (11th Cir. 2016) (citing <u>Danley v. Allen</u>, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled on other grounds as recognized by* <u>Randall v. Scott</u>, 610 F.3d 701 (11th Cir. 2010).[9] However, in this action, Plaintiff Cooley contends that at no time during the alleged uses of force was he disobedient or resisting the officers. Any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment, <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1098 (11th Cir. 2014), unless the plaintiff's version of facts are "blatantly contradicted by the record". <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>see also</u> <u>Morton v. Kirkwood</u>, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that

---

[9]     The Eleventh Circuit has recognized that "pepper spray is an accepted non-lethal means of controlling unruly inmates. It is designed to be disabling without causing permanent physical injury and is a reasonable alternative to escalating a physical confrontation. Therefore, a short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders. <u>Pearson</u>, 665 F. App'x at 864 (internal citations and quotations omitted).

testimony becomes incredible."). Here, the record does not "completely and clearly" contradict Cooley's version of the facts.

The record confirms that Cooley was sprayed with SABRE RED. Other than the parties' clashing stories, however, the record is void of any facts corroborating whether or not the chemical agent was necessary – that is, did Cooley disobey orders to "cuff up" or was he compliant? At this stage of the case, the court is required to construe the evidence in the plaintiff's favor, thus, showing there was no reasonable need for the application of force. See Williams v. Rickman, 759 F. App'x 849 (11th Cir. 2019) (District court erred in granting summary judgment where Plaintiff's sworn statement created an issue of fact as to whether plaintiff created a disturbance warranting the use of pepper spray). Accordingly, a reasonable jury could find that the spraying of SABRE RED was administered for reasons other than a good faith effort to maintain discipline. Defendants' contention, that the force was used because Cooley refused to follow direct order(s), merely creates an issue of fact that cannot be resolved on a motion for summary judgment.

As to Cooley's claim that the defendant officers hit him, repeatedly, with batons while in the elevator, the parties' again present factual versions in direct opposition to one another. If the jury believes the defendants' version, that they never hit, struck, or used any force against Cooley while in the elevator, then there can be no constitutional violation. If the jury believes Cooley's version of the facts, then striking an unresisting and secured inmate without penological justification

certainly offends common standards of decency and represents a constitutional violation. Defendants point to the record, namely the lack of a body chart following the January 30, 2017 incident and the "unsubstantiated" I&I claim, to show that Cooley was not hit or struck in the elevator. However, the undersigned finds sufficient evidence in the record that a reasonable jury could find supports Cooley's claim. Notably, the I&I Investigation Report describes the existence of video surveillance which "clearly shows" Cooley getting up from his knees as the elevator doors open. The I&I Investigation Report also indicates that while the defendant officers denied use of any force, the investing agent found their testimonies to be untruthful. Furthermore, the medical records indicate that Cooley was examined in the health care unit on the evening of the incident (which was not detailed in the I&I Investigative Report), where he complained of pain from being "physically assaulted today by DOC." (Doc. 27-2 at 3). At that time, the nurse noted abrasions to Cooley's back, middle back, and lower back. (Id. at 4). When Cooley was again examined the next day, on January 31, 2017, Cooley was noted as having a busted lower lip and redness and bruising on his lower and upper middle back. (See Doc. 27-1 at 4; Doc. 27-2 at 5). Therefore, construing the evidence in the plaintiff's favor as the law requires at this stage of the action, a reasonable jury could find that force was applied unnecessarily or for reasons other than a good faith effort to maintain discipline. Accordingly, Defendants' motion for summary judgment should be denied on the claims of excessive force.

**B.    Denial of Medical Care.**

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In <u>Sims v. Mashburn</u>, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

<u>Sims</u>, 25 F.3d at 983 (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)).  To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id.</u> (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by* <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)).  "In either of these

situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve

life-threatening conditions or situations where it is apparent that delay would

detrimentally exacerbate the medical problem." Id.

> The "seriousness" of an inmate's medical needs also may be decided
> by reference to the *effect* of delay in treatment. Where the delay
> results in an inmate's suffering "a life-long handicap or permanent
> loss, the medical need is considered serious." An inmate who
> complains that delay in medical treatment rose to a constitutional
> violation must place verifying medical evidence in the record to
> establish the detrimental effect of delay in medical treatment to
> succeed. Further, we have held that "[t]he tolerable length of delay
> in providing medical attention depends on the *nature* of the medical
> need and the *reason* for the delay." Consequently, delay in medical
> treatment must be interpreted in the context of the seriousness of the
> medical need, deciding whether the delay worsened the medical
> condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

Turning to Cooley's complaint, he alleges injuries associated with both the

spraying of the chemical agent and the alleged assault in the elevator. As to the

assault, Cooley claims he suffered bruising, swelling, and knots. These described

injuries, however, are representative of the types of claims which are not

considered to be objectively serious medical needs pursuant to Eighth Amendment

case law. See Fernandez v. Metro Dade Police Dep't, 397 F. App'x 507 (11th Cir.

2010) (The Eleventh Circuit reversed the district court's finding of a serious

medical need where the arrestee suffered a bloody nose and mouth, which lasted

over five minutes, facial bruising, pain, disorientation, and blood clogs in his

nose.); Martin v. Gentile, 849 F.2d 863 (4th Cir. 1998) (The plaintiff, who suffered

a cut over one eye, a quarter-inch piece of glass embedded in his palm, and bruises

on his shoulders and elbows, failed to establish an objectively serious medical

need.); <u>McKnight v. Garriott</u>, No. 3:15-cv-159-J-39JRK, 2018 U.S. Dist. LEXIS 195489 (M.D. Fla. Nov. 16, 2018) (The plaintiff alleges he was beaten and hogtied while handcuffed and suffered bleeding from his face, wrists and shoulder, swelling to the left side of his face, a significant abrasion to his head, as well as head, torso and back pain, and severe headaches. The court concluded the plaintiff failed to demonstrate an objectively serious medical need because the injuries were minor, did not require treatment from the hospital, and he was able to be released to the institutional for confinement.). Accordingly, Cooley cannot establish an Eighth Amendment deliberate indifference claim based on injuries from the alleged assault - even if the assault is found to be unconstitutional.

As to Cooley's claim that he was denied a body chart and decontamination following the January 30, 2017 incident, as alleged in his complaint,[10] the issue for the court is whether or not Cooley suffered from prolonged exposure to effects of the SABRE RED used against him or only the temporary, immediate effects.

---

[10] Defendants contend Cooley refused a body chart and medical evaluation upon arrival at the health care unit, supported with the submitted Release of Responsibility Form dated January 30, 2017 at approximately 8:25 a.m. (Doc. 27-2 at 2). The form, however, is not signed by Cooley as affirmed by Defendant Nurse Dixon. Instead, the form is signed by three witness (one of which is Nurse Dixon) acknowledging that Cooley refused the body chart and refused to sign the form. (<u>Id</u>.). Furthermore, Cooley consistently denies throughout all his pleadings that he refused a body chart following the incident, and the medical records confirm that Cooley returned to the health care unit for a body chart later the same evening. Given the totality of the evidence, it cannot be said that Cooley's version of the facts is contradicted by the record. Instead, a reasonable jury could credit Cooley's version of the story and determine he was denied a body chart upon arrival at the health care unit on the morning of January 30, 2017.

The Eleventh Circuit has held that "temporary discomfort" of pepper spray, like SABRE RED, does not represent an objectively serious medical need, whereas "the effects of prolonged exposure to pepper spray with inadequate decontamination and poor ventilation" does. Danley v. Allen, 540 F.3d 1298, 1311 (11th Cir. 2008) (Danley alleged suffering chemical conjunctivitis and bronchospasms because of a delay in medical treatment.); see also McNeeley v. Wilson, 649 F. App'x 717 (11th Cir. 2016) (Effects of pepper spray were not considered a serious medical need where there was no evidence that the plaintiff's cell was poorly ventilated); Allen v. Bosley, 253 F. App'x 658, 660 (9th Cir. 2007); Wade v. Colaner, No. 06—cv—3715 (FLW), 2009 U.S. Dist. LEXIS 23057, 2009 WL 776985, at *10-12 (D.N.J. Mar. 20, 2009) ("the normal effects of pepper spray on a person, i.e. burning, are not of the kind to constitute a serious medical need").

In this case, it is undisputed that Cooley suffered the immediate effects of the SABRE RED spray. It is further undisputed that Cooley informed the defendant officers of these symptoms (as evidenced by the Defendant officers' affidavits and I&I investigation testimony) and that he was taken to the health care unit for evaluation. However, other than Cooley's conclusory statement that he was taken back to his contaminated cell "still having difficulties breathing", the record is void of evidence indicating that Cooley suffered needlessly or for any length of time from lingering, prolonged effects of the chemical spray. (See Doc. 1 at 6). Namely, Cooley fails to allege that he complained to any officer or nursing staff of any symptoms or difficulties while in the health care unit or once he

returned to his cell. Cooley makes no allegations of continued burning, that he suffered pain while in his cell, that his cell had poor ventilation, that he was not allowed to clean his cell, or that he ever requested a decontamination shower. Cf., Danley, 540 F.3d at 1311 ("The serious medical needs Danley alleges . . . are the effects of prolonged exposure to pepper spray with inadequate decontamination and poor ventilation, not the immediate effects of the pepper spray." And, the jailers knew of and ignored Danley's pleas for help.). Furthermore, the record reflects when Cooley returned to the health care unit that same evening on January 31, 2017, he failed to voice any complaints of breathing difficulties; his oxygen level was normal; his respiratory signs were normal; his lung sounds were clear. Instead, he explained to the examining nurse that he had been hit with batons by officers in the chest and back (with no mention of being sprayed with a chemical agent) earlier that day. Likewise, Cooley never complained of chemical spray related symptoms on any subsequent health care visits, sick call requests forms, or medical grievances. Thus, it appears from the record, Cooley's condition resolved completely without worsening and without treatment. See Farrow, 320 F.3d at 1243 ("[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention", and "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm."). Consequently, the record lacks any facts suggesting Cooley suffered lingering, exacerbated effects, or serious injury from the chemical spray. Thus,

the undersigned concludes that Cooley fails to state a deliberate indifference claim as to this incident.

Assuming Cooley could establish an objectively serious medical need to invoke Eighth Amendment protection, Cooley fails to allege sufficient facts to show that Defendants acted with deliberate indifference — i.e., that they were subjectively aware of "a risk of serious harm" to Plaintiff and disregarded that risk through "conduct that is more than mere negligence." See Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (discussing the deliberate indifference standard of inadequate medical treatment). First, it is undisputed that the defendant officers escorted Cooley to the health care unit following the January 30, 2017 incident. Second, Defendant Nurse Dixon's statement to Cooley, callous as it may be, fails to indicate a known risk of serious harm and deliberate indifferent to that risk. Rather, according to Cooley, Nurse Dixon indicated by her remark (that Cooley was alright because he could still talk) that she believed Cooley to be in stable condition, without signs of respiratory distress or serious health concerns. Nurse Dixon's actions, therefore, represent negligence at most. See Wilson v. Seiter, 501 U.S. 294, 305, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (mere negligence does not satisfy the deliberate indifference standard). Deliberate indifference requires more than a showing of negligence or medical malpractice, and a misdiagnosis will not suffice. McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999) (holding that although "failure to diagnose can be deemed extremely negligent, it does not cross the line to deliberate indifference."). Third, the record

is void of Cooley informing any Defendant of a medical need, symptom, or complaint while in the medical unit or thereafter and being denied medical treatment. Consequently, Cooley has failed to establish that Defendants were subjectively aware of a serious medical need on January 30, 2017 and ignored the same.

Additionally, the medical records are void of evidence that Defendants were deliberately indifferent to Cooley's medical needs at any time. In fact, quite the opposite. Cooley submitted sick call requests on February 11, July 10, August 15, August 17, and October 10, 2017, complaining of pain associated with a physical assault from correctional officers on January 30, 2017, and he was scheduled prompt appointments for each sick call request (although he refused to be seen for three appointments associated with these sick call request). (Doc. 27-1 at 4-6). On September 7, 2017, the prison physician noted chronic low back pain on Cooley's medical chart and ordered x-rays of his lumbar spine and tibia/fibula. The x-rays were taken on September 29, 2017 and revealed a "normal lumbar spine series" (finding "anatomic alignment of lumbar vertebrae" and "normal shape and ossification pattern" to the vertebral bodies) and "normal left tibia and fibula" with no fracture or dislocation seen.[11] (Doc. 27-2 at 18). Thus, the record

_____

[11]     In his complaint, Cooley pleads that he has been denied an MRI scan and requests that one be conducted. The record clearly evidences that an x-ray scan has been performed and reflected normal results. Accordingly, Cooley's desire for an additional scan equates to a disagreement in medical treatment and such claims do not rise to a constitutional level. Whether the medical defendants "should have employed additional diagnostic techniques or forms of treatment is

belies the claim that Defendants knew of a risk to Cooley's health or safety and disregarded the risk or that his condition was worsened by any delay in treatment. Consequently, Cooley has failed to establish deliberate indifference on the part of Defendants, and Defendants should be granted summary judgment on the claim of denied or delayed medical care asserted against them.

### C.  Immunity Defenses.

In response to the allegations of this suit, Defendants have asserted all available immunity defenses.

To the extent Plaintiff's claims are against the correctional officers in their official capacities, Defendants are immune from suit, as the liability imposed, in reality, is on the entity the individuals represent versus the individuals themselves.  Brandon v. Holt, 469 U.S. 464, 471-72, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985).  The determination of the entity represented by the defendants for purposes of determining immunity from suit under 42 U.S.C. § 1983 is determined by reference to state law.  Carr v. City of Florence, 916 F.2d 1521, 1525 (11th Cir. 1990).  Alabama law holds that a sheriff is a state, rather than a county, official for purposes of immunity from suit.  Parker v. Amerson, 519 So.2d 442 (Ala. 1987); Ala. CONST. Art. V § 112 (listing county sheriffs as members of the state's executive department); see also Taylor v. Adams, 221 F.3d 1254, 1256

---

a classic example of a matter for medical judgment and therefore not an appropriate basis for liability under the Eighth Amendment." Adams v. Poag, 61 F. 3d 1537, 1545 (11th Cir. 1995).

(11th Cir. 2000) ("Alabama sheriffs operating jails are state officers protected by Eleventh Amendment immunity."). Similarly, "employees of the sheriff, deputies [and officers] in their official capacities, are [] entitled to Eleventh Amendment immunity." Scruggs v. Lee, 256 F. App'x 229, 232 (11th Cir. 2007); Lancaster v. Monroe Cnty., 116 F.3d 1419, 1429 (11th Cir. 1997) ("[J]ailers are state officials for the purpose of Eleventh Amendment immunity."). There is no dispute that Defendants, in their official capacities as prison correctional officers, are arms of the state for Eleventh Amendment Immunity purposes and are therefore barred from suit for monetary damages in this action.

Defendants further assert the defense of qualified immunity as a bar from suit against them in their individual capacities. Qualified immunity offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L.Ed.2d 565 (2009). A party is eligible to claim qualified immunity if he was acting within the line and scope of his employment. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). Once a defendant

establishes that he was acting within the scope of his discretionary authority at the time of the alleged constitutional violation, the burden shifts to the plaintiff to overcome the official's qualified immunity. <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002); <u>Mikko v. City of Atlanta</u>, 857 F.3d 1136, 1144 (11th Cir, 2017). There can be no doubt in this action, the defendants were acting within their discretionary authority. Thus, the undersigned moves on to the second step.

The Supreme Court has mandated a two-step analysis for resolving qualified immunity claims. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). First, a court must decide whether the facts that a plaintiff has alleged "show the [defendant's] conduct violated a constitutional right." <u>Id</u>. Second, the court must decide "whether the right was clearly established." <u>Id</u>. The determination of these elements may be conducted in any order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). However, the Eleventh Circuit has made clear that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in <u>Hudson</u> and <u>Whitley</u>." <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted). As to the denial of medical care claims, Defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. <u>See</u> <u>Belcher v. City of Foley, Ala</u>., 30 F.3d

1390, 1395 (11th Cir. 1994). As discussed above, Cooley has failed to show that Defendants acted with deliberate indifference to a serious medical need. Accordingly, Defendants are entitled to qualified immunity on the denial of medical care claim asserted against them.

### D. Transfer Request.

As part of his requested relief, Cooley seeks a transfer from the facility where the incident of this action occurred.

The record confirms that since the filing of this action, Cooley has been transferred from Holman Correctional Facility to St. Clair Correctional Facility. Due to his transfer, the request for injunctive relief is moot. See Spears v. Thigpen, 846 F.2d 1327, 1328 (11th Cir. 1988) ("[A]n inmate's request for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once an inmate has been transferred (citation and internal quotation marks omitted)), *cert. denied*, 488 U.S. 1046, 109 S. Ct. 876, 102 L. Ed. 2d 999 (1989). Accordingly, Cooley's requests for injunctive relief is due to be dismissed as moot.

### E. Criminal Charges Brought Against Defendants.

As part of his requested relief, Cooley demands criminal charges be brought against Defendants.

It is well established that private citizens can neither bring a direct criminal action against another person nor can they petition federal courts to compel the criminal prosecution of another person. Maine v. Taylor, 477 U.S. 131, 137, 106 S.

Ct. 2440, 91 L. Ed. 2d 110 (1986); see also Otero v. United States Attorney General, 832 F.2d 141, 141 (11th Cir. 1987) ("[A] private citizen has no judicially cognizable interest in the prosecution or non-prosecution of another."). "A decision to prosecute is within the United States Attorney's substantial discretion . . . ." United States v. Ballard, 779 F.2d 287, 295 (5th Cir.), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986).

A court is precluded from ordering a prosecution by the United States Attorney based on the separation of powers doctrine and because the determination of whether to commence a prosecution is a process that was not contemplated for the courts to engage in and, therefore, the courts are not equipped to handle a prosecution. Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 379-82 (2d Cir. 1973) (affirming the dismissal of a complaint seeking the investigation and prosecution of persons who allegedly violated federal and state criminal statutes). "As a general rule, the courts are not free to interfere with the prosecuting officer's discretionary decision to prosecute crime." United States v. Spence, 719 F.2d 358, 361 (11th Cir. 1983). Moreover, a federal court cannot compel state prosecutors to commence a prosecution. Inmates of Attica Correctional Facility, 477 F.2d at 382-383; accord Van Sickle v. Holloway, 791 F.2d 1431, 1436 n.5 (10th Cir. 1986) (holding that the federal courts "have no authority to issue [a writ of mandamus] to direct state courts or their judicial officers in the performance of their duties." (internal quotation marks omitted)).

Thus, Plaintiff's request that criminal charges be brought against the defendants is not cognizable in a §1983 action and should be dismissed.

## IV.    Conclusion.

Based on the foregoing, it is recommended that:

1. Summary Judgment be **GRANTED** in favor of all Defendants as to Plaintiff's Eighth Amendment claims for Denial of Medical Care.

2. Summary Judgment be **DENIED** as to Defendants Plaintiff's claims of excessive force asserted against Defendants Streeter, Arthur, Bullard, Pacheco, and Earl.

3. Plaintiff's request for a transfer be **DISMISSED**.

4. Plaintiff's request for criminal prosecution of Defendants be **DISMISSED**.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** and **ORDERED** this **19th** day of **May 2020.**

*/s/ Katherine P. Nelson*
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.